v. National Labor Relations Board, and I think first up will be Mr. Altell, and we'll hear from you whenever you're ready. Thank you, Your Honor. The question before the court today is whether or not individuals who are engaged to provide janitorial services at the Social Security Administration in Woodlawn, Maryland maintain a primarily rehabilitative as opposed to industrial relationship with their employer, VSP. If, as VSP contends, it is primarily rehabilitative, the individuals are not employees under Section 2.3 of the National Labor Relations Act, and they cannot organize for purposes of collective bargaining. The Fourth Circuit has previously addressed this issue in 1998 in the Baltimore Goodwill case and found that individuals providing janitorial services at the same physical campus, the Social Security campus in Woodlawn, are not employees covered by the National Labor Relations Act. For many of the same reasons that the court relied upon in Baltimore Goodwill, we believe the same conclusion should be reached in the current matter. But, of course, the reasons are what's important because what we're reviewing are findings of that, right? That's correct. That's correct, Judge Motz. And this is, as we were discussing in the hallway, this is a very factually intensive case, a 1,200-page record. The legal standards are relatively straightforward. It is set forth most recently in the NLRB's Brevard Achievement Center decision where the board set forth a multi-factor test to be used. But the question really is the same question that was presented to the Fourth Circuit back in 1998 in Baltimore Goodwill, whether or not it's primarily rehabilitative versus something which is typically industrial. So looking at the facts, we first have to look at the legal standard that is to be applied, and the question is whether or not the NLRB's decision is supported by substantial evidence in the record as a whole. In 1999, in Sam's Club decision, the Fourth Circuit elaborated upon what it means to be supported by substantial evidence in the record as a whole. And the court explained that the number in the record fairly detracts from the board's fact-finding, and explained further the board is not free to prescribe what inferences from the evidence it will accept and reject, but must follow all of those inferences that the evidence fairly demands. We believe that the board erred in this case because it failed to take into account the that the individuals are employees who are working in a typically industrial relationship. Applying the factors set forth in Brevard Achievement Center, I'll talk first about counseling, rehabilitation, and training. We have a lot of facts in there, and I must say, if you undertake the task that you're trying to argue, it's going to be an uphill battle. The record has a lot of evidence in it, and for us to question the weight of the evidence the board took is a difficult task for an appellate court, the second guess. But your argument seems to omit and leave out the whole Javits-Wagner Act program, and the nature of the program, and what Congress wanted in this program. And the idea that every one of these employees are under that program and are all, at least 75 percent of them, are disabled, as defined by the act, which has to be certified every year. And the question is, people under that act, should they be subject to organization? And that act is so non-economically oriented. It's all rehabilitative focused. There is regulation. I took a little look into this, and I didn't get a lot of help from your brief. But if you go through the regulations on the requirements, the checks, the different people that organize, the amount of pay they get, who sets the pay, it's the charitable organization here that's doing this. No court until the Georgia court, no court had ruled that people under that program were subject to organization. And you yet start digging down into the weeds and talking about the facts. I think it's hard to overcome with it. I mean, the LLB had a lot of testimony. It's a big record, and it goes different directions. But the bigger picture is that this is, by definition, a rehabilitative program of the disabled, and they have to be severely disabled. And those disabilities are defined. And the people on this list, some of them are mentally disabled, physically disabled. It's in the record. And that program seems to me the antithesis of an industrial organization where the employees are seeking economic benefit. These employees are not seeking economic benefit. They're trying to learn how to hold down jobs, to be placed, to have something constructive. They're all in janitorial positions. And none of these points are advanced. And I sort of asked the question, and I'm going to ask both sides, whether there's an almost a categorical approach that we should not be subjecting these disabled people to union organization when they don't even perform in an economic sense. As a matter of fact, it's all an exception to economics. And the Brevard decision focused on economic issues in collective bargaining as distinct from the rehabilitative, which are not subject to collective bargaining. But you go ahead and present your argument. But I'm telling you where I personally find the issues more interesting is in the overall structure of the program, the purpose of the program and its success in terms of the program. We have incidents where there are employees that stayed a long time and some of them stayed a long time for a lot of different reasons. It doesn't show rehabilitation if they just stay there. But some of them can't get jobs. Some of them just quit. Some of them don't show up. Some are fired. But that doesn't go to the notion that they need representation to improve their economic condition. They need help in the rehabilitation. And that's what the Javits program does. And it's got programs and subprograms. It's got monitoring. The employees can only work in a public place for the federal government. This is not the private industry of any kind. The conditions go on and on. If you read in through the regulations. I'm a little surprised that the government doesn't coordinate with the other branches of its government, which are promoting this program. This is a NLRB, which is trying to promote representation, which is a terrific thing to promote. But it's for economic benefit. These people are getting very low incomes. They're specified by a rate schedule the government provides. Social Security pays those rates. And VSP takes no extra money. They take just the amount paid to the employees. So there's no economic issue for VSP, which is a nonprofit. And so the question now is, what is the overall nature of these employees? Are they industrial employees? Are they rehabilitated? And Judge Niemeyer, we would agree that they are in a, like I would think. Yes, that would be a shock. But what is interesting is you didn't argue any of that. Well, because the board has asserted jurisdiction in the past. You haven't briefed that issue. We did not delve into that in the brief because we did not believe we were prevailing. What authority do we have to decide on issues not presented to us? And so we did not believe as a matter of law that these individuals are categorically exempt from coverage by the National Labor Relations Act. Categorical and playing with the language. The question is, in your brief below to the board, you did talk about the program at some length. Right. And that to me was the most persuasive argument you made. When you're brief on appeal, you abandoned all that. I don't know if you abandoned it, but it's certainly not emphasized. You focus on whether the board had sufficient facts in the record to make the findings it did. And I'm going to say, you pick any fact in there and I'll bet you we'll find evidence to support it. Every fact that they found. It's the problem for me is that loses the forest to the trees. I mean, and the forest is this is a rehabilitative program, not an economic program. Nobody is profiting on it. This program is the goodwill of Sinai Hospital in sponsoring these people and paying them. And and they're trying to help out these 44 employees. And I, I don't see why it's useful to say that they're industrial employees, but not because of what you're arguing, but because of the whole structure of the whole program. And it's not that this is an exception to the program because it's certified every single year. And there's investigations made and the and the definition of disability is very severe. I mean, we people with Down syndrome, other types of things that people do their work at their own pace. That was the testimony here. It's you're trying to help them come to work every day, have a job, create the dignity of humankind and try to place them if we can. That is, I mean, we agree, Your Honor. I mean, I think we view this the same and perhaps we erred in not emphasizing this in our brief, but we viewed this as because of the structure of the Javits-Wagner Act, by definition, the individuals, at least 75 percent, must be severely able. I mean, the language from the CFR is that they must be unable to engage in normal competitive employment. So that does obviously dramatically limit their abilities to work in a typically industrial relationship. And we believe there was literally hundreds of pages of testimony from. You're going to go all into that. You have to go into Source America. You have to go in NISH. Source America is a national industries for severely handicapped that's sponsoring this. You have to go into NISH. You have to go into the president's committee. All these reviewing committees that determine the nature and structure of this program, which is designed completely and 100 percent to rehabilitate people who are disabled. And you know how they get into the system from places like Chimes and disabled people in Baltimore City. They're trying to get these people off the streets and out of bad situations and rehabilitate them. And none of that is emphasized in your brief. You talk about what an individual does on a day to day basis. And your honor, we have to work with the record that we have. And you don't have this. You have this record. They're all part of the program that was presented to the court below. I mean, the board. It's just you chose to argue the substantial facts, which I think is when we're reviewing an agency. I don't know where I'm going to go on this. My colleagues will probably kick me and say the facts support this. And I'd say, OK. Your honor, and I believe that in this case, we have overwhelming facts, even under a standard of whether it's supported by substantial weight. We have overwhelming facts to show that the NLRB aired here and there's compelling evidence in the record showing that the I see my time is up. OK. We'll hear from who's next. Up deck, Mr. White. Are you number two in the batting order? Yes, your honors. Thank you, your honor. May it please the court. Eric Weitz on behalf of the National Labor Relations Board. Mr. Weitz, before you begin what you probably prepared, do you have any response to what Judge Niemeyer said? Yes, Judge Motz. I was going to begin to hopefully respond to Judge Niemeyer, your line of questioning. So the agency's first response, which I think came up in some of the questioning, of course, would be that that that issue was not presented in this case and was not litigated. And so our position would be it's not properly before the court, specifically before the board. Correct, your honor. Their briefs extensively go into the nature of the program and the benefits. And and but the if you really get into the program, the deeper you get into it, the farthest issue from from the considerations of the program are economics. The economics are basically donated money. What what is the real guts of the issue is let's get some people better. Let's get them to learn how to work. Let's get them to feel good about a job. And they have these various programs. They have their president's committee, Source America and all these that have inputs and reviews. And then they have to work for the federal government. And in this case, I suppose a profit, I don't know if a profit company could supply it, but it's in this case, it's a nonprofit. They basically pay the employees. And the only thing they get back from Social Security Administration is the reimbursement of pay. That's the nature of the contract. And so those were those facts, but not in that detail. But those facts were presented to the board and there was a sort of background facts that introduced those facts to the board. But then the arguments were, as you made them for the board and as responded to. And you put in a good case. I mean, you put in a lot of facts in there, but I wonder why you don't want these disabled persons who are trying to make it want them to be organized. I mean, that's for what purpose? I guess you can provide a grievance procedure. It provides, I don't know if you can even improve their economic circumstance through collective bargaining. You might be able to, but I'm talking about legally because their income is determined by a rate schedule. Well, I think I have a substantive response to your questions, Your Honor, but just returning briefly to the procedural response. There was certainly some facts that this is a contract under the Javits Act and some of the details of that. However, what's I think very clear is that the employer was never challenging the board's established Brevard County standard and the established criteria for this exception. So the actual legal test that the board applies was not challenged. And even if it had been challenged, I would submit that this court has already affirmed it in the Baltimore Goodwill case that you can have employees who are working under these types of contracts for government agencies who either can have the rights or can be excluded based on this established test. But turning to the more substantive... Holding that goes the other way for you. The basic, that's an acknowledgment. Well, and I think it's a hard case to make. I tend to sound that this should be categorical, and I don't think any court has said that. But it seems to me in the overall structure of the federal government, on the one side, you're promoting collective bargaining. On the other side, you're trying to get good employees. You're trying to develop people who can be employees. But these people are at a stage where they haven't become employees yet in the labor sense. They're trying to be rehabilitated. And so I would think that an overall czar in the federal government would balance these two agencies, say, well, we've got this Javits program. Let's leave collective bargaining alone there until they become employees and then let them bargain. Yes, well, the first response would be returning just to Baltimore Goodwill. I think the court obviously disagreed and reversed the board there on the PACs. But I think the court clearly affirmed the board's legal test for determining whether this acceptance should apply. Well, that's the Brevard test, right? Correct. Yeah, I think it's the right test. I think it's absolutely right. My only question is Brevard breaks it down between economic issues and rehabilitative issues. They use the word economic promotion, I think, and another one calls it industrial employee or whatever. But I think that's absolutely right, because the whole purpose of collective bargaining is an economic issue. It's to prove the terms and conditions in the workplace and provide grievances in this type of place. Then, but the question is, if you look at this program under Brevard. I have a hard time seeing how it satisfies the economic more than the rehabilitative, because I think the whole design of the program is to rehabilitate these people. And it's not always succeeding, which means there's working as severely disabled people, working as janitors. And they're trying to get them to come to work every day and show up every day. I do I do have a factual response. I mean, obviously, all of your honors questions are well taken about the importance of this federal policy under the Javits Act. I would first the whole program for this, this group, right? Certainly is doing it under the Javits program as a as a as a as a charity type operation. Well, they're taking people out of the out of the charities in Baltimore City who are severely disabled and have trouble getting jobs. And they're picking those people up and paying them as employees and putting them in government locations. Well, I think what's that's not exactly correct, your honor. I think it would be helpful to clarify why this case is different from, for example, Baltimore Goodwill or the Davis Memorial D.C. Circuit decision. Those cases, the Davis Memorial, Colorado, as a matter of fact, I only know of one that goes your way. All the rest of them go say that these people under the Javits program are not subject to collective bargaining. Well, it's a it's a small universe of cases. I know. But actually, so Davis Memorial, for example, I think was the type of program that your honor is talking about, where it was clearly both components of it. The the actual skills rehabilitation component and the job site contract were an integrated whole in that case. So, for example, in Davis Memorial, when disabled individuals are initially referred to this program, they were initially at a job or a location where they were solely receiving rehabilitation and job skills training and mental health counseling and those sorts of things. And at that location, when their productivity hit a certain threshold, 75 percent of a non-disabled employee, they were automatically transferred to a job site where they continued to receive training. And if they had any issues there, they were automatically referred back to the rehabilitation facility. So it was an integrated continuum. And I think as the D.C. Circuit held in that case, that is the sort of program that I think your honor is referring to, where the employer is solely attempting to rehabilitate employees. Well, my my I didn't dig in the facts deliberately because I think you have a mighty powerful case on the facts. That were found by the board. My comments go to the notion that. While the facts on any given individual here may add up to this or that, the whole program was designed to rehabilitate and the fact that every year the program is assessed and evaluated to make sure that that's what they're doing, serving the purpose of the program. And so while there's there's what you can have, 25 percent non-disabled people, they make sure that they're 75 percent severely disabled and other factors, whatever the assessments are. And these are done by specialized agencies. So this is not just a normal employee employee relationship. This is a program under the federal government, a welfare program helping people get better. And that is that's my general observation. And while there are facts that contradicts it, individual facts, as the board found. I think I think your honor, there's significant programmatic facts in this case. And first, I just know, obviously, that is the purpose of some of these federal statutes. But I would I would push back a bit. I think it's actually a very complicated regime as to what funding is going where. And in this case, VSP has two separate and distinct programs at certain points in the employer's brief. They attempt to to merge them. But in fact, what the facts show is that when disabled individuals are referred to VSP through various governmental agencies with the sole goal of helping disabled individuals, they are sent to these entirely separate vocational skills program, which receives also received federal funding under some combination of federal statutes. But they're not the potential people here. Correct. Your honor, those those individuals are not an issue here. What actually happens is disabled individuals are referred to that program. They undergo weeks of training and have on site mental health and other rehabilitative professionals. And here they've essentially graduated that program and have been placed at this job site. Some of the individuals who have gone through that program are placed at completely normal employers like McDonald's or Walmart. And some of them are placed at a contract that the employer also maintains, but treats them as employees. That's good for them. That's terrific. I mean, that's that's succeeding. And maybe you go to McDonald's and organize the employees or authorize them to vote on a on the issue. But we're talking about a group that went out to Social Security. And I looked at the as much as could be revealed about that group. And there's a bunch mentally, severely mentally disabled. There's a group severely physically disabled. I mean, it's and these are not one or two. It's out of the 47. They're large portions of each. And I'm sure we're not allowed to see all the medical stuff. But it impressed me that this program was such a beneficial program. Well, absolutely, your honor. But I would note that the you know, the board in this case in no way is penalizing the employer or calling into question the excellent work that they do. And that, for example, Miss White would have to negotiate with the union over matters which are really rehabilitative in nature. In other words, they have a whole program as to counseling. And they have six people that are attached to this group. And they have a specified program. The way you do it, they have charts as to how they work. They fire people who don't respond, which is one of the facts that was found that some people. And I think those I mean, some of those points go to the actual facts of this case and the analysis the board did. And the board found and we would submit substantial evidence supports these findings that the the actual rehabilitative aspects of this job site is very minimal. And and as a sort of meta point, it doesn't qualify under the Javits Act. In other words, they are monitored every year for that. Well, my understanding, Your Honor, is that the employer self certifies them. And again, I don't think all of the details of that complex statutory scheme are litigated. My understanding is that arguably the main thrust of that program is not is to provide employment opportunities for disabled individuals, which is why the main criteria is 75 percent need to be classified as severely disabled. But as sort of a meta response, Your Honor, and again, you know, our main response would be it's not really properly an issue here. But I would respectfully push back, Your Honor, that I don't I don't I'm not aware of any indication in the Javits Act that Congress intended to deny disabled employees or disabled workers the rights that they're entitled to under federal law. I agree with you. I agree with you. But I'm taking the Javits Act is where it is and all the supporting institutions that function under it. And they're all focused on identifying severely disabled persons and trying to help them get better in society. And they have a bunch of different rules, all kinds. I ended up getting an additional memorandum from one of my various fine law clerks about what does a program require? And it's quite amazing. I mean, it's a regulation after regulation under the program. And so when you look at that, you say, how is this economically driven when every aspect of this program is intended to rehabilitate somebody? That's my fundamental question. And that takes the Brevard standard, which is between the economic and the anyway, I do understand. I don't want to impose some categorical motion on your argument on the facts because you make a good argument on the facts. But I would like to hear your argument with respect to the categorical approach. Well, I usually talk about civil cases, but go ahead. Well, I mean, obviously, the board, which you didn't brief and which was raised. Correct. I mean, that would be our primary. I understand that. I do understand that. And that may be well, maybe a winner. Assuming that, you know, there had been a challenge to the Brevard County test or Baltimore Goodwill and that the actual board test was that issue. I think, you know, returning to the response I was giving before, I'm not aware of any. I see that my time is up. You can answer my question. Please answer the question. I'm not aware of any indication under the Debit Act or any other statute that Congress wanted to treat disabled workers who Congress wanted in the workplace, treated with dignity and respect as workers, that they should be denied all of their rights under federal law. I mean, the implications of that would not only be. I think that's too direct a conclusion. In other words, what I would insert there, you might agree, is that the Javits program is directed. It doesn't go to whether they can't be employees. It goes to taking disabled employees and trying to abilitate them. And then the question now, you have to now move to Brevard and say, are these employees when they're in the program? Are they being treated for rehabilitative purposes? Are they industrial workers? And which Brevard makes clear means economically motivated. Right. And I guess the very brief answer to that, then, Your Honor, would be that, you know, we would submit that rather than having a categorical rule, the board is well placed to look at the, you know, setting aside what a given employer is supposed to be doing or what the regulations are part of the Javits Act. The ultimate inquiry, this is a very fact-specific case-by-case analysis, is what is going on at this workplace. And here the board developed a very extensive factual record, and we would submit correctly found and as supported by the evidence that there's very minimal rehabilitation going on at the Social Security job site. There's only one counselor who's there part-time. She's not a trained mental health professional or rehabilitative professional. She's, in the employer's own terminology, an ad hoc and supplemental services case manager, who certainly does admirable work and helps these individuals. But I think in this case there's very minimal evidence that there's any actual rehabilitation going on to these individuals who for all reasons are treated as employees, are subject to discipline, are regularly terminated, are required to do the same work as non-disabled individuals who receive the same pay, health insurance and benefits, and many of whom treat this as their career and work here for many years. And so rather than having a categorical approach based on what the regulations of the Javits Act and related statutes require, we would submit it's reasonable to have a fact-specific inquiry, which is what the Brevard County test is, and to develop a factual record of what's really going on at a particular workplace. And at this particular workplace, we would submit there's very minimal rehabilitation going on. And for that reason, we would submit that the board correctly found that this is not primarily rehabilitative under the board-created, non-statutory exclusion to the definition of employee. All right. Thank you. Thank you. Who's up next? I believe it may be me, Your Honor. Okay, it is you. I see Ms. McIsa. Yes. Good morning. May it please the Court. My name is Ashley McIsa. I am counsel for the union intervener in this case. And the reason that the union has intervened is to defend the collective bargaining rights of the individuals who are working for VSP at the SSA PDEB site. And these individuals have elected the union by an overwhelming majority to represent them in bargaining with the employer over their terms and conditions of employment. Yet, if you look through the record, at nearly every stage of this case, the employer has made efforts to prohibit these individuals from exercising their statutorily guaranteed Section 7 rights. And I kind of want to address, Judge Niemeyer, your concern here and jump off what NLRB's counsel, Mr. White, said, is that I think it's clear from the record that once these individuals are placed at VSP's site, VSP has no concern with fostering a rehabilitative relationship with the disabled janitors working at that site. And I think it's clear that VSP's motivation in this case is ultimately to prohibit all individuals from organizing, regardless of their disability status. And I think this is clear when you look at the record in this case. At the first day of hearing, the employer took the position that disabled and non-disabled individuals are treated differently at its site. When you go through that factual record, to VSP's surprise, turns out that all of these individuals are treated exactly the same. VSP stipulated at the beginning of the first day of hearing that non- There's probably facts to support it, but there was also quite a bit of testimony that the counselors, the six of them that were assigned one part-time, I think, on the site, were assigned to respond and counsel the disabled. And when asked whether they would counsel a person who was not disabled, they said they wouldn't turn them away, but that was not their purpose, and they devoted most of their attention to the disabled. That was the, I forgot the woman's name, but the main head of the program. The director, I believe it was Lisa Mule's point taken, Your Honor. But I do want to highlight that at the beginning of the hearing, the employer took the position that a unit comprised of non-disabled individuals would be an appropriate unit. And after the first day of hearing, the employer changed its position. It took the position that both the non-disabled and disabled individuals would be an inappropriate unit. And its primary argument in taking this position is that a unit comprised of solely non-disabled individuals would be inappropriate because they have a community of interest with the disabled employees at the site. Now, in taking this position, the employer implicitly conceded that these group of workers do not have distinct terms and conditions of employment as compared to the disabled individuals working at the site, which is one of the factors used in the Brevard analysis. And I think all that the employer has proven, again, is that there's virtually no distinction between the working conditions imposed upon these two groups of employees. The only objective difference is their disability status. And under the NLRA, by its terms, the NLRA does not exclude disabled individuals from being covered by the Act. Again, the test is, is there a rehabilitative relationship here? Are we doing things at this contract site to ensure that disabled individuals can enter into the workforce as intended under JWAG? And, obviously, it's the union's position that, no, it has not fostered that type of relationship with these individuals here. And I think that's plain, and I won't go into the 1,200-page record, when you look at the facts on the whole, that the employer is not primarily concerned with fostering a rehabilitative relationship with these individuals. Thank you. Thank you. All right. I think, Mr. Haltel, you're back up, right? Correct, Your Honor. Thank you. Your Honor, first I will note, although it certainly was not our main focus, we did raise at page 12 of our brief the fact that the individuals are referred to VSP from DOORS or the Veterans Administration or similar entities and are covered by JWAG, the Javits, Wagner, or Day Act. So we have raised the issue as kind of the factual background to show, by definition, anybody who is one of those 35 disabled persons at the site must be severely disabled. So we did raise the issue at page 12 of the brief. But I also want to just argue with my opposing counsel, which I suppose is my job, to highlight that there really is quite a bit in the record that supports the fact it's a rehabilitative relationship. We have, first off ---- Let me ask you this. There's quite a bit of evidence that supports that, and there's quite a bit of evidence that doesn't support that. What's our role? Well, I believe that the board improperly ignored the greater weight of the evidence, really, which is evidence that shows it is not an industrial relationship. If you look at the record as a whole ---- Is that our standard of review? Pardon me? Is that our standard of review? The standard of review goes back to whether or not, looking at the record as a whole, it is supported by substantial evidence. And, again, to go back to the Sam's Club ---- Is that the standard supported by substantial evidence? Substantial evidence in the record as a whole, and, again, taking into account ---- You said that substantial evidence is simply more than a scintilla. It is more than a scintilla. But I believe where the board erred in this case ---- That's a tough standard. Pardon me? That's a tough standard. I recognize ---- It's a law you're in your shoes. It is an uphill ---- But this court has previously, in Baltimore Goodwill, found there to be sufficient omissions, essentially. Look at Baltimore Goodwill. In Baltimore Goodwill, you had a very factually analogous situation to the extent we can deduce what the record showed. There, in Baltimore Goodwill, there were two union witnesses or board witnesses who testified that they had not received counseling. And the board relied upon that in finding that the individuals were covered by Section 2.3 of the Act. When it got before your predecessors at this level, the Fourth Circuit looked at the evidence the board had not relied upon, which showed that, in fact, these individuals had been counseled, and used that, in part, to reverse ---- What year was that case? 1998. And I believe we have a similar situation here. If you looked at the evidence ---- I did check on my drive down this morning to see if you were on the panel. Were we all on the court then? I have to say this. I pulled over the rest stop on I-64 to make sure that none of you were on the panel back in 1998. But they may have been your colleagues. But in the current case, the evidence relied upon the board is really very slim. You have two witnesses, one of whom, Mr. Parker, is disabled. The other is not disabled. That would be Ms. Tyler. Mr. Parker is the only one who testified he was disciplined and did not get any kind of counseling. But when you look at what he actually testified to, he said, I was asked to go see Ms. White for the opportunity to have her give me rehabilitative counseling. I declined to do so. So the only factor that you want to talk about is counseling. And I think you're right. The evidence on counseling is most favorable to you of all of these other factors. But if you look at any of the other, and I'm not sure that you even went on counseling, but if you look at all of the other factors, for example, the terms and conditions of employment or the imposition of production standards or the tenure of employment or the disciplinary procedures, they all go against you. I think you're different, Judge Moss. I know you differ, but there are substantial findings, and all we need is a scintilla. So maybe you want to talk about them instead of the one that is most helpful to you. Well, let's look at discipline. So Ms. White's testimony in the case of discipline was that there was an individual in the probationary period who was counseled and coached eight, nine, ten times, that's a quote, before the individual was terminated, whereas others are terminated after only one or two latenesses. And that's exactly what the board relied upon in North Georgia when the board found in the North Georgia decision that the evidence showed it weighed in favor, although ultimately it ruled against the employer. It found on the issue of discipline the evidence weighed in favor of a rehabilitative relationship because in North Georgia an individual received progressive discipline six times for failing to perform his job duties versus only three times for non-disabled. More disabled janitors were discharged than successfully moved on to outside employment. Over a five-year period, that is correct. That's a correct guess. I mean, I think we've all tried to tell you. First of all, re-arguing the facts is not helpful in any case, really, because we take the facts as they were found, and if there's substantial evidence supporting them, you know, sort of across the board in cases we have found. So I don't know that it's helpful, and I particularly don't think it's helpful in this case because there are lots of facts and lots of findings against you. And I would agree there are lots of findings against us, but I do not believe that when you delve into the 1,200-page record, Your Honor, that those findings are supported by the testimony of either the union witnesses or the employer's witnesses. And that's in large part where we believe the board erred, and we believe that's similar to what happened in both Davis and in Baltimore Goodwill, where the circuit court reversed the finding of the lower court. I know I'm almost out of time. I'm not going to rehash the facts. I think I know where you stand on that. But I do believe there is enough evidence that was ignored by the board to show that the board ignored its statutory duty to review the record as a whole and also consider the evidence which detracts from the board's finding as well as that which supports it. Thank you. All right. Thank you, Mr. Paltrow. All right. I appreciate counsel's arguments. It is our custom and practice to come down and shake your hands, and we're not going to give up that practice. I think it's been around for a while, and it perhaps defines our court in some respect, but under the existing protocols, we're still observing that and are masking as you're accommodating us on. So we very much appreciate having your arguments. You have to accept our greetings at this point as our shaking of hands, and when you come back again at a later time, we'll shake your hands. You'll all be before us again, I'm sure. But we enjoyed your arguments. You did a good job, and we'll adjourn court until this afternoon.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Robert B. King